**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Adam Hageman,<br><br>               Plaintiff,<br><br>v.<br><br>Morrison County, Shawn Larsen (sheriff), Scott McKissock (jail administrator), Tim Brummer (jail programmer), Jason Worlie (sheriff's deputy), Mark Dzieweczynski (sheriff's deputy), Joan Mushel (correctional officer), Jennifer Orth (correctional officer), Mike Whitlow (correctional officer), Andy Waltman (correctional officer), Ethan Wise (correctional officer), and Shannon Anderson (correctional officer),<br><br>               Defendants. | Case No. 19-cv-3019 (JRT/HB)<br><br><br>**REPORT AND RECOMMENDATION** |

HILDY BOWBEER, United States Magistrate Judge

       Plaintiff Adam Hageman alleges that jail staff at the Morrison County Jail violated his rights to free speech, free exercise, and due process, and that one battered him, while he was jailed there.  Defendants' filed a Motion for Summary Judgment [ECF No. 112].[1]

---

[1] This is Defendants' third motion for summary judgment.  The first motion [ECF No. 55] was denied without prejudice because the Court had ordered Defendants to produce to Hageman certain video and audio records that he had not yet had time to review.  [*See* ECF Nos. 89, 90, 110.]  At the Court's direction, Defendants withdrew a second motion [ECF No. 101] because it was premature.  [ECF No. 110.]

This matter has been referred to the undersigned Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1) and District of Minnesota Local Rule 72.1. For the reasons set forth below, the Court recommends granting partial summary judgment.

## I.    PROCEDURAL BACKGROUND

Hageman filed a 46-page complaint, accompanied by another 173 pages of exhibits, on December 3, 2019, asserting 15 claims against 17 defendants. (Compl. [ECF No. 1].) Because he applied for IFP status, this Court screened his claims pursuant to 28 U.S.C. § 1915A(a) and recommended that a number of his claims and several of the named Defendants be dismissed from this lawsuit. (Apr. 22, 2020 Report and Recommendation [ECF No. 5].) The R&R was adopted and those claims were dismissed by the Honorable John R. Tunheim, United States Chief District Judge, on June 30, 2020. (June 30, 2020 Order Adopting R&R [ECF No. 20].) In a separate order, this Court permitted Hageman to serve the remaining Defendants and to proceed with certain claims against those Defendants. (*See* April 22, 2020 Order at 1–2 [ECF No. 6].) Specifically, the Court determined that Hageman had sufficiently pleaded the following claims:

- Interference with Hageman's exercise of religious freedom;

- Retaliation for Hageman's 2018 federal civil rights lawsuit (*Hageman v. Morrison County Jail*, *et al,* No. 18-cv-1005 (JNE/LIB) (D. Minn. 2018)) (hereafter the "2018 Lawsuit") and interference with his exercise of his right to free speech;

- Violations of due process by placement in administrative detention or similarly restricted confinement, and improper notice and appeal process;

- Conspiracy to violate Hageman's rights in furtherance of Defendants' retaliation;

- Vicarious liability by Morrison County for the above-described conduct of its employees; and

- Common law battery by Defendant Jennifer Orth.

(*Id.*) Of these, all but the last is pleaded under 42 U.S.C. § 1983.

Communication problems and delays with Hageman also created uncertainty for the Court over which of Hageman's multiple filings to consider for this motion. The Court issued an order seeking clarity on this question [ECF No. 128], and Hageman confirmed that the memoranda filed at ECF Nos. 122 and 127 constituted his response to the third motion. (Hageman Ltr July 19, 2021, at 2–3 [ECF No. 134].) He clarified that another memorandum filed at ECF No. 130 was merely a copy of ECF No. 122. (*Id.* at 3.)

Once Defendants replied [ECF No. 135], the Court closed briefing on the motion and took it under advisement without a hearing. [ECF No. 137.]

## II.    FACTUAL BACKGROUND

Hageman has been detained in the Morrison County Jail on at least two occasions. In the 2018 Lawsuit, he alleged civil rights violations in connection with his detention in that jail in February 2018. (*See* 2018 Lawsuit Compl. [ECF No. 1].) That case was dismissed with prejudice on January 16, 2019, on the basis of the fugitive disentitlement doctrine, as Hageman was at the time a fugitive from justice after having been convicted on three felony charges and then failing to show up for sentencing. (*See* 2018 Lawsuit R&R (Dec. 18, 2018) and Order Adopting R&R (Jan. 16, 2019) [ECF Nos. 30, 31].)

Hageman alleges in the instant lawsuit that after he was re-arrested and returned to

detention at the Morrison County Jail in late July and August 2019, he was subjected to

retaliation and mistreatment in part because of that prior civil rights lawsuit. (*See*

*generally* Compl.)  All his surviving claims in this case pertain to that period of detention

before he was sentenced and transferred to a Minnesota state prison.[2]  Those claims and

the facts of record relating to them are more fully described below.[3]

     Morrison County Jail staff booked Hageman into the jail on July 25, 2019.

---

[2] As explained in the Court's April 22, 2020 R&R at fn. 2, it appears from a review of accessible public records that Plaintiff was convicted by jury on May 23, 2018, and then failed to appear on August 15, 2018. *See State v. Hageman*, Case No. 49-CR-16-1124 (Morrison Cty. Dist. Ct.), http://pa.courts.state.mn.us/CaseDetail.aspx?CaseID=1623469558 (last accessed Apr. 19, 2020).  In late July 2019, he was arrested and returned to custody, and he ultimately was sentenced on August 28, 2019, and transferred out of the jail on August 29, 2019.  *See also* MacKissock Decl. Ex. 5 [ECF No. 115-1].

[3] Hageman signed his Complaint, declared that the allegations were "true and correct to the best of my knowledge, wisdom and belief," and had his signature notarized. (Compl. at 45 (citation to pagination supplied by ECF).)  In addition, Hageman submitted a declaration in opposition to the pending motion that he executed under penalty of perjury. (Hageman Decl. [ECF No. 123-1 at 2–7].)  Accordingly, to the extent—but only to the extent—the statements within the Complaint and Declaration purport to describe specific facts of which Hageman has personal knowledge and would be competent to testify, and that would be admissible in evidence, the Court will treat them both as declarations for purposes of this Motion.  *See* Fed. R. Civ. P. 56(b)(4).  "A plaintiff's verified complaint is the equivalent of an affidavit for purposes of summary judgment . . . [and] the facts alleged in a verified complaint need not be repeated in a responsive affidavit in order to survive a summary judgment motion." *Roberson v. Hayti Police Dep't*, 241 F.3d 992, 994–95 (8th Cir. 2001).  *See also Williams v. Adams*, 935 F.2d 960, 961 (8th Cir. 1991). On the other hand, the Court has not considered as evidence Hageman's notes attached to his complaint (*see, e.g.,* ECF No. 1-4) because they are hearsay.  The Court has also not considered allegations of fact contained in Hageman's memoranda in opposition to the instant motion because they were not signed under penalty of perjury.  (Mem. Opp'n Mot. Summ. J. at 18 [ECF No. 122]; Suppl. Mem. at 6 [ECF No. 127].)

(Compl. ¶ 1.)  He alleges that, while inventorying his property, jail staff ripped the covers, binding, and pages of his grandmother's Bible, which he brought with him to the jail, and removed handwritten notes from his grandmother.  (*Id.*)  Hageman had a second Bible, which the staff did not damage.  (*Id.*)  The staff permitted Hageman to keep both Bibles in his cell.  (*Id.* ¶ 3.)[4]

The next day, Defendant Correctional Officer Ethan Wise placed Hageman into disciplinary lockdown.  (*Id.* ¶ 4.)  Lockdown is disciplinary detention used for rule violations.  It separates an inmate from the rest of the jail population and permits him to leave his cell for only one hour per day.  (MacKissock Decl. ¶ 9 [ECF No. 115]).  Wise reported at the time (and reiterated in his declaration submitted in support of this motion) that he placed Hageman into lockdown after Hageman twice refused Wise's order to retrieve his spoon from his lunch tray so the officer could collect the tray.  (Wise Decl. ¶ 6 [ECF No. 116], Wise Decl. Ex. 9 [ECF No. 116-1 at 2[5]].)  Disobeying an officer's

---

[4] Hageman referred to the Bible as an exhibit in several filings (e.g., Hageman Decl. Opp'n First Mot. Summ. J. Ex. 3 [ECF No. 76]), but no such exhibit was docketed.  In response to the Court's inquiry [ECF No. 128], Hageman stated he mailed the remains of his Bible to the Clerk's Office on March 20, 2021, as an exhibit to his response to Defendants' first motion for summary judgment.  (Hageman Ltr July 19, 2021, at 5–8 [ECF No. 134].)  However, Clerk's Office personnel have not found such a Bible and have no record of ever having received it.

[5] The exhibits filed with Defendants' declarations were filed as a single attachment to each declaration.  Accordingly, when referring to specific documents within that attachment, the Court will include the ECF number and the page number as assigned by the ECF system.  The Court will do the same when referring to Hageman's declaration submitted in opposition to the instant motion, which was filed as a single attachment along with a number of other exhibits. [ECF No. 123-1.]

direct order is a violation of the jail rules. (*Id.* [ECF No. 116-1 at 3]; MacKissock Decl. Ex. 13 [ECF No. 115-1 at 48].)  Hageman insists that Wise never ordered him to remove the spoon.  (Hageman Decl. ¶ 6 [ECF No. 123-1 at 3].)

Wise extended Hageman's lockdown on Sunday, July 28.  He reported that he saw Hageman on the cell block camera bang a closet door against the wall when opening it, and then spray the camera with cleaning solution and walk away, obscuring the video image.  (Wise Decl. Ex. 10 [ECF No. 116-1 at 5]; MacKissock Decl. Ex. 11 at 02:17:40–02:30:00 pm[6]).  He extended Hageman's lockdown for vandalizing jail property and sabotaging a jail security device.  (Wise Decl. Ex. 10 [ECF No. 116-1 at 6]; MacKissock Decl. Ex. 13 [ECF No. 115-1 at 48–49.)

---

[6] Defendants submitted the following video evidence on a USB memory stick, to which both parties refer in their submissions:  MacKissock Decl. Ex. 11 [Placeholder ECF No. 115-1 at 29]; MacKissock Decl. Ex. 15 [Placeholder ECF No. 115-1 at 52]; MacKissock Decl. Ex. 17 [Placeholder ECF No. 115-1 at 53].  Hageman submitted additional video evidence on two DVDs [Placeholder ECF Nos. 126, 133] but did not assign exhibit numbers.  Of those, the files relevant to this recommendation are:  20190821083800_mpg [ECF No. 133]; 20190821141801_mpg [ECF No. 133]; 20190823063300_mpg [ECF No. 133].  Citations to video use the internal time displayed in the upper left corner of the footage.  The videos do not have audio, so any information about noises and speech comes from written reports or the parties' declarations.

Hageman's DVDs also included 151 audio files.  Of those, the files relevant to this recommendation are:
MNMorrison_20190817_143332_PhoneCard_2188310402 [ECF No. 133]
MNMorrison_20190821_140743_PhoneCard_2182325333 [ECF No. 133]
MNMorrison_20190821_141312_PhoneCard_3202325673 [ECF No. 133]
MNMorrison_20190821_142014_PhoneCard_2182320528 [ECF No. 133]
MNMorrison_20190821_142315_Normal_3202597727 [ECF No. 133]
MNMorrison_20190821_142818_PhoneCard_3202325673 [ECF No. 133]

Defendant Lieutenant Scott MacKissock[7] met with Hageman on the morning of Monday, July 29, to deliver and discuss the violation reports for the Friday, July 26 spoon and Sunday, July 28 camera incidents.  (Compl. ¶ 4(d); MacKissock Decl. ¶¶ 1, 13.) MacKissock dismissed the lockdown for the spoon incident because he concluded that although Wise had asked Hageman to remove his spoon, it was not clear Wise had given Hageman a direct order to that effect.  (Compl. ¶ 4(d); MacKissock Decl. ¶ 13; Wise Decl. Ex. 9 [ECF No. 116-1 at 3].)  But MacKissock sustained the lockdown for the camera incident and Hageman signed the camera violation report, signifying that he accepted the punishment and waived his rights to appeal.  (Wise Decl. Ex. 10 [ECF No. 116-1 at 6].)

Hageman asserts that later that evening he asked Wise if the unjustified spoon incident lockdown was in retaliation for his 2018 lawsuit, and Wise agreed that it was, even though Wise was not a defendant to that lawsuit.[8]  (Compl. ¶ 5.)  At some point after this, Hageman spoke with Defendant Correctional Officers Mike Whitlow, Andy Waltman, and Jennifer Orth about their parts in an alleged conspiracy against him when he was jailed at Morrison County in 2018.  (*Id.* ¶ 6–6(c).)  He asserts both Whitlow and Waltman apologized for the conspiracy.  (*Id.*)  Hageman claims he also spoke with Correctional Officer Beth Larson, who told him the other officers had targeted him.  (*Id.*

---

[7] Lt. MacKissock's last name is misspelled as "McKissock" in the caption of the Complaint. The Court will use the correct spelling.

[8] Wise does not mention this alleged conversation in his declaration.

¶ 6(d).)

Wise and Hageman had a third conflict on August 11. Hageman spoke to Wise as he performed a security check in Hageman's cell block. (Wise Decl. Ex. 14 [ECF No. 116-1 at 8]; MacKissock Decl. Ex. 15 at 07:31:10 – 07:32:10 am.) Wise reported at the time and reiterates in his declaration that Hageman struck an intentionally intimidating stance and told him to listen when Hageman spoke and to call Hageman "sir." (Wise Decl. ¶ 10; Wise Decl. Ex. 14 [ECF No. 116-1 at 8].) Hageman denies trying to intimidate Wise. (Hageman Decl. ¶ 9 [ECF No. 123-1 at 3].) Hageman had done the same thing the previous night and received a verbal warning that his behavior could land him in lockdown, so Wise imposed lockdown for disorderly conduct. (Wise Decl. ¶ 10; Wise Decl. Ex. 14 [ECF No. 116-1 at 8]; MacKissock Decl. Ex. 13 [ECF No. 115-1 at 48].) Due to the lockdown, Wise did not allow Hageman to attend a church service scheduled for that morning. (Compl. ¶¶ 7–11.)

Later that morning, Hageman made several requests to speak with law enforcement about Wise, to which Defendants Sheriff's Deputy Mark Dzieweczynski and Sergeant Joan Mushel responded by visiting his cell to take a report. (*Id.* ¶¶ 18–21.) Dzieweczynski offered Hageman a complaint form, which Hageman rejected and instead requested a recorded interview without Mushel in the room. (*Id.* ¶ 22–23.) Hageman claims Dzieweczynski refused the request and refused to listen to Hageman's explanation of Wise's conduct, or his explanation of how Whitlow had admitted to Hageman that there was a conspiracy against him when he was jailed at Morrison County in 2018. (*Id.*

8

¶¶ 6–6(b), 23–24.)  Dziewecsynski slammed the cell door in Hageman's face and left the cell block without giving Hageman the form.  (*Id.* ¶¶ 24–26.)

The next encounter happened on August 12, when MacKissock delivered a copy of the violation report for the intimidation incident to Hageman.  (MacKissock Decl. ¶ 15.)  He sustained the lockdown and offered Hageman a 23-day penalty, but Hageman rejected it and requested an appeal hearing.  (*Id.*; Wise Decl. Ex. 14 [ECF No. 116-1 at 9].)

The Inmate Handbook allows an inmate to appeal a violation report and request a hearing, during which they may call three witnesses plus adverse witnesses, cross-examine adverse witnesses, and bring their own evidence.  (MacKissock Decl. Ex. 13 [ECF No. 115-1 at 50–51].)  The handbook also promises the panel will be made up of impartial decision-makers uninvolved in the incident.  (*Id.*)

The jail held the hearing before a panel of Defendants Jail Program Director Tim Brummer and Sheriff's Deputy Jason Worlie, plus a third officer, none of whom were involved in the alleged intimidation incident.  (MacKissock Decl. ¶ 16; Wise Decl. Ex. 14 [ECF No. 116-1 at 10–11].)  The panel affirmed the violation and imposed 28 days of lockdown.  (*Id.*)

Following the hearing, Hageman was not permitted to attend a jail ministry weekend retreat called Residents Encountering Christ (REC) on August 17–18 because he was in lockdown.  (Compl. ¶ 15; Hageman Decl. ¶¶ 20–21 [ECF No. 123-1 at 6]; Brummer Decl. ¶ 6–7 [ECF No. 117].)

9

On August 21, Brummer and MacKissock met with Hageman to discuss a report of two more rules violations from the day before. (Compl. ¶ 29; Compl. Ex. M [ECF No. 1-4 at 29]; Answer ¶ XII [ECF No. 18].) Brummer spoke to Hageman through his closed cell door, eventually sliding the report through a gap into the cell. (20190821083800_mpg at 08:39:20–08:42:12 am.) After several minutes, he left and returned with MacKissock. (*Id.* at 08:42:12–08:44:10 am.) MacKissock opened the cell door, spoke with Hageman, then closed the door and left the cell block with Brummer without the report in hand. (*Id.* at 08:44:10–08:44:50 am.) Hageman claims he asked to appeal the violation, but MacKissock refused to allow him to sign the report because he was locked in the disciplinary segregation cell. (Compl. ¶¶ 30–31.)

Hageman asserts that minutes after this encounter, he overheard MacKissock say to Brummer, "If he won't give us the paper let's kill him." (*Id.* ¶ 32.) Neither the Complaint nor Hageman's declaration specifies what "paper" they were referring to, but the immediately preceding encounter had involved the report of Hageman's rule violation from the day before, suggesting that that was the "paper" in question. Hageman states they were standing outside the entrance to the jail, and the position of his cell enabled him to hear the conversations of people in that spot. (*Id.* ¶¶ 13, 32.) They then returned to his cell and entered it as Brummer said "We are going to come in there and take it from you," and "Give me the papers." (*Id.* ¶ 33.) Hageman claims Brummer "grabbed an envelope" that was addressed to the federal courthouse in Minneapolis and that contained a portion of the complaint Hageman intended to file in this case. (*Id.* ¶¶ 34–

35.)  Hageman states the envelope "tore nearly in half" as Hageman grasped it and pulled it away from Brummer and "retreated to the back of [his cell]," after which the officers left.  (*Id.* ¶¶ 34, 36; *see also* Hageman Decl. ¶ 19 [ECF No. 123-1 at 5]; Compl. Ex. A-2 [ECF No. 1-5] (damaged envelope).)[9]

Hageman placed several phone calls that afternoon to his family members and attorney, asking them for help contacting the FBI:

> MNMorrison_20190821_140743_PhoneCard_2182325333
> MNMorrison_20190821_141312_PhoneCard_3202325673
> MNMorrison_20190821_142014_PhoneCard_2182320528
> MNMorrison_20190821_142315_Normal_3202597727
> MNMorrison_20190821_142818_PhoneCard_3202325673

He also filed several grievances and requests with the jail.  (Hageman Decl. Ex. 12 [ECF No. 123-1 at 21–37].)

On August 23, Whitlow delivered Hageman's breakfast tray to his cell.  (Hageman Decl. ¶ 15 [ECF No. 123-1 at 5].)  Hageman filed a grievance with the jail claiming that Whitlow put the tray on his toilet bowl, and repeated that claim in his declaration.  (*Id.*; Hageman Decl. Ex. 12 [ECF No. 123-1 at 30, 36].)  The cell block camera captured Whitlow carrying the tray into the cell and bending forward out of the camera's view as if setting the tray somewhere, then leave without it.  (20190823063300_mpg.)

---

[9] While there is security footage showing the encounter among MacKissock, Brummer, and Hageman described in the preceding paragraph, there is no security footage showing MacKissock and Brummer re-entering Hageman's cell as Hageman alleges in his complaint, nor do MacKissock or Brummer address this allegation in their declarations. Therefore, the only description of that alleged second encounter comes from Hageman.

In another incident, Hageman was whistling in his cell while reading his Bible when another inmate threatened to kill him if he kept whistling. (Compl. ¶¶ 58–60.) He reported the threat to Defendant Correctional Officer Shannon Anderson, as well as to Waltman and Wise, but they did nothing in response. (Compl. ¶¶ 63–69; Hageman Decl. Ex. 12 [ECF No. 123-1 at 32].)

Hageman had an incident on August 23 involving Orth. He and Orth were in the booking office to retrieve an orange shirt for Hageman to wear to a scheduled meeting with his attorney. (Orth Decl. Ex. 16 [ECF No. 118-1 at 2].) Hageman tried to follow Orth into a clothing closet attached to the booking office where she was getting the shirt. (*Id.*; MacKissock Decl. Ex. 17 at 11:54:40 – 11:55:00 am).) The closet door blocks the booking-office camera's view of their interaction for four seconds. (*Id.* at 11:55:00 am.) Orth reported, and reiterated in her declaration, that she put up her hand to stop Hageman and told him inmates were not allowed into the closet. (Orth Decl. Ex. 16 [ECF No. 118-1 at 2]; Orth Decl. ¶¶ 6-7.) Hageman accused her of pushing him, a claim he also included in his declaration; she states she only stopped him from walking any further. (Orth Decl. ¶¶ 6-7; Hageman Decl. ¶ 11 [ECF No. 123-1 at 4].) Orth closed the closet door, at which point the camera captured her and Hageman arguing in the booking office as he put on the shirt and walked out of the room to meet his attorney. (Orth Decl. Ex. 16 [ECF No. 118-1 at 2]; MacKissock Decl. Ex. 17 at 11:55:00 – 11:55:25.)

Hageman alleges further encounters with Brummer on August 28. Hageman claims Brummer and MacKissock again slid the August 20 violation report through his

closed cell door that morning and told him to sign it "or else." (Compl. ¶¶ 71, 79; Compl.

Ex. M [ECF No. 1-4 at 29].)  Hageman allegedly refused to sign it without talking to a

lawyer and refused to return it when Brummer demanded it back.  (Compl. ¶¶ 80–82.)

Hageman claims Brummer responded by charging at him while saying, "we are going to

come in there and take it from you" and "we are going to take all of your paperwork."

(*Id.* ¶ 83.)  He claims Brummer also said that a "lawsuit will never happen."  (*Id.* ¶ 71.)

Neither Defendants' declaration addresses these alleged encounters, and there is no video

footage.

Hageman claims that later that same day, Brummer interrupted him attempting to

call the FBI from the cell block phone, and moved toward Hageman in a threatening

manner that caused Hageman to flee into his cell.  (Compl. ¶ 70; Hageman Decl. ¶ 16

[ECF No. 123-1 at 5].)  However, the camera footage cited by Hageman in support of this

allegation is dated August 21 and only shows Brummer stepping into the cell block while

Hageman was on the phone, Hageman dropping the phone and fleeing into his cell, and

Brummer promptly leaving the cell block without approaching Hageman or his cell.

(Hageman Decl. ¶ 16 [ECF No. 123-1 at 5]; 20190821141801_mpg.) Brummer's

declaration does not address the alleged encounter.

Hageman was sentenced on August 28, then transferred to a Minnesota state

prison on August 29.  (Ervin Decl. Ex. 18 [ECF No. 114-1 at 21].)  Hageman alleges that

all of his paperwork concerning this lawsuit was confiscated by MacKissock and

Dzieweczynski when he was called to the booking office on August 29.  (Compl. ¶ 87.)

13

### III.    STANDARD OF REVIEW

Defendants move for summary judgment on all of Hageman's claims under Federal Rule of Civil Procedure 56(a).  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The substantive law underlying the claim or defense at issue determines which facts are material.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Factual disputes that are irrelevant or unnecessary will not be counted").  "There is a genuine issue of material fact if there is enough evidence that a reasonable jury could return a verdict for the nonmoving party" on that issue.  *Farver v. McCarthy*, 931 F.3d 808, 811 (8th Cir. 2019) (quotation omitted).

The moving party bears the burden to identify the claim or defense for which it seeks summary judgment and the record evidence showing that there is no genuine issue of material fact.  *Richardson v. Omaha Sch. Dist.*, 957 F.3d 869, 877 (8th Cir. 2020).  In response, the non-moving party must "submit affidavits, depositions, answers to interrogatories, or admissions on file and designate specific facts" to show a genuine dispute of material fact.  *Gander Mountain Co. v. Cabela's, Inc.*, 540 F.3d 827, 831–32 (8th Cir. 2008).  When reviewing the parties' arguments, a district court construes the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in the nonmoving party's favor.  *Anderson*, 477 U.S. at 248.  A court must also give liberal construction to a pro se plaintiff's complaint when considering a defendant's

14

motion for summary judgment.  *Solomon v. Petray*, 795 F.3d 777, 787 (8th Cir. 2015)

("While Solomon's pro se complaint and addendum did not expressly connect the dots,

these documents clearly allege that Thomas's blow occurred during an episode in which

others were threatening Solomon for his protected expression. . . . As with all motions for

summary judgment, we simply construe the facts in the light most favorable to the non-

moving party and afford him all reasonable inferences supported by the record.").

That said, the non-moving party must present "more than a mere scintilla of

evidence in support of his position," *In re Paul*, 739 F.3d 1132, 1135 (8th Cir. 2014), and

"[c]onclusory assertions and citations to one's own arguments are insufficient to survive

summary judgment," *Johnson Tr. of Operating Eng'rs Loc. #49 Health & Welfare Fund*

*v. Charps Welding & Fabricating, Inc.*, 950 F.3d 510, 524 (8th Cir. 2020).  The non-

moving party may not simply point to the record generally, but must cite the record with

sufficient particularity to direct the court to the specific facts that show a genuine issue.

*Id.; see also* Fed. R. Civ. P. 56(c)(1)(A) (a party asserting that a fact . . . is genuinely

disputed must support that assertion by "citing to particular parts of materials in the

record").   Even if there is some relevant information in the record, the court is not

required to "mine a summary judgment record searching for nuggets of factual disputes

to gild a party's arguments."  *Charps Welding & Fabricating, Inc.*, 950 F.3d at 524.  *See*

*also Pedroza v. Cintas Corp. No. 2,* 397 F.3d 1063 (8th Cir. 2005) (the burden on a party

resisting summary judgment is to designate the specific facts that create the triable

question of fact); *Crossley v. Georgia-Pacific Corp.*, 355 F.3d 1112, 1114 (8th Cir.

2004); *Jaurequi v. Carter Mfg. Co.,* 173 F.3d 1076, 1085 (8th Cir. 1999).

## IV.   DISCUSSION

In his memorandum in response to Defendants' motion, Hageman states that "[i]t is [his] position that there is adequate legal and factual basis for all claims in relation to include (1) interference with First Amendment Right of Religious Freedom; (2) retaliation for engaging in First Amendment protected activity; (3) violation of the Right to Due Process; (4) conspiracy; (5) vicarious liability; and (6) common law battery." (Mem. Opp'n Mot. Summ. J. at 2 [ECF No. 122]; *see also* Suppl. Mem. at 4–5 [ECF No. 127].)  The Court will address those claims in order.

### A.   Hageman's Failure to Sufficiently Identify How Defendants Were Personally Involved

Defendants first argue that Hageman fails to identify how Defendant Sheriff Shawn Larsen, as well as Defendants Worlie, Dzieweczynski, Mushel, Whitlow, Waltman, and Anderson were personally involved in his § 1983 claims.  (Mem. Supp. Mot. Summ. J. at 14.)  To prevail under 42 U.S.C. § 1983 against an individual defendant, whether in that defendant's personal or official capacity, a plaintiff must show that individual was "personally involved" in the violation alleged in the lawsuit.  *White v. Jackson,* 865 F.3d 1064, 1081 (8th Cir. 2017).  Generalized references to "Defendants" collectively are not sufficient.  *See Flores v. Moser*, Case No. 16-cv-1860 (ADM/KMM), 2019 WL 2016789, at *8 (D. Minn. Jan. 7, 2019).

Giving Hageman's pro se complaint a liberal construction, it lays out all the specific interactions described in the facts section above, then explicitly "reincorporates"

those allegations as support for his claim that "the defendants retaliated, discriminated, and violated Plaintiff's Constitutional and Civil Rights." (Compl. ¶ 72.) For all of the Defendants other than Sheriff Larsen, there are sworn allegations of specific conduct by those individuals that are tied to one of more of the specific claims that survived Defendants' motion to dismiss.

In the remainder of this R&R, the Court will examine whether those allegations are sufficient to withstand summary judgment, but they do at least identify some element of specific involvement as to each. However, the Court agrees that neither Plaintiff's Complaint nor his declaration identify specific facts that establish involvement by Larsen in the surviving claims. Larsen's alleged involvement appears limited to Hageman making a few requests to speak with him. (Compl. ¶¶ 27, 38–39.) The complaint claims generally that Larsen denied Hageman due process, (*id.* ¶ 73), but it does not describe specifically Larsen's involvement in the disciplinary actions against Hageman. This bare claim cannot support any of Hageman's § 1983 claims against Larsen. The Court therefore recommends granting summary judgment for Larsen.

## B. Claims of Interference with Free Exercise of Religion

Hageman claims that Defendants are liable under 42 U.S.C. § 1983 (2020) for interfering with his right to the free exercise of his religion guaranteed by the First Amendment of the U.S. Constitution.[10] (Mem. Opp'n Mot. Summ. J. at 6.) Section 1983

---

[10] Hageman also argues in his response to this motion that Defendants violated his religious liberty under the Minnesota Constitution and the Religious Land Use and Institutionalized Persons Act (RLUIPA). (Mem. Opp'n Mot. Summ. J. at 6–7.) His

allows a person to sue a state or local government employee for relief when the employee causes "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.

The First Amendment, applied to states through the Fourteenth Amendment, forbids the government from interfering with a person's free exercise of their religion. U.S. CONST. amend. I, XIV, § 1; *see Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). Inmates have constitutional free exercise rights, but courts balance those rights against the security and safety challenges facing prison administrators. *Mbonyunkiza v. Beasley*, 956 F.3d 1048, 1053 (8th Cir. 2020). To strike that balance, courts employ a two-part test. First, an inmate must show that the challenged action of the jail substantially burdened his sincerely held religious beliefs. *Id.*

> To substantially burden an inmate's free exercise of religion, a prison regulation must significantly inhibit or constrain conduct or expression that manifests some central tenet of a person's individual religious beliefs; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion.

*Id.*

The burden then shifts to the government to show that the challenged action or

---

complaint repeatedly references the First Amendment, generalized religious discrimination, and § 1983 as the basis for his claims. (Compl. ¶¶ 4, 10, 15–16; at 13a–16a, 41.) Even construing his pro se complaint liberally, *Earl v. Fabian*, 556 F.3d 717, 723 (8th Cir. 2009), his complaint offers no hint that he wished to raise either a state constitutional claim or a claim under RLUIPA in addition to his § 1983 claims. He cannot seek to add those claims to his case at this late date.

regulation reasonably relates to legitimate penological interests. *See Turner v. Safley*, 482 U.S. 78, 94–98 (1987). The court must weigh four factors in this inquiry. First, does the government show a "valid rational connection" between the jail's challenged action and the government interest justifying it? *Murphy v. Missouri Dep't of Corr.*, 372 F.3d 979, 982 (8th Cir. 2004) (citing *Turner*, 482 U.S. at 89–91). Second, does the jail offer alternative means for the inmate to exercise his religious rights? *Id.* Third, if the jail accommodated the inmate's specific religious practices, would the accommodation cause "a significant 'ripple effect'" on the guards, other inmates, and prison resources? *Id.* at 982–83. Fourth, could the jail accommodate the inmate "at de minimis cost to valid penological interests[?]" *Id.* at 983. Applying this test, the Court recommends that summary judgment be granted.

Taking Hageman's claims one at a time, Hageman first argues that an unnamed booking officer at the Morrison County Jail substantially burdened his religious liberty by damaging one of his two Bibles during the booking process, preventing him from acting on a sincere belief that he should study scripture every day. (Mem. Opp'n Mot. Summ. J. at 6–7.) Nowhere in the Complaint or in his declaration in opposition to the instant motion does Hageman identify any of the remaining Defendants as the person who damaged one of his two Bibles. Therefore, Defendants are entitled to summary judgment on this element of Hageman's free exercise claim.

Hageman next argues that Defendants substantially burdened his free exercise by preventing him from attending REC and one Sunday church service on August 11 while

19

in lockdown.[11]  Defendants do not contest that Hageman exercised his sincere religious beliefs through attendance at weekly church service and REC, and that Hageman's journaling while in the jail revealed a desire to attend church service.  Defendants also do not contest that Hageman could not attend the church service and REC because he was in lockdown.  Defendants respond, however, that they only temporarily denied him access to a religious service and REC, which does not rise to a substantial burden.  (Mem. Supp. Mot. Summ. J. at 17–18.)

The Court agrees with Defendants that denying access to a single church service and a single weekend religious retreat did not "significantly inhibit" conduct expressing a central tenet of Hageman's individual religious beliefs, nor deny him reasonable opportunities to engage in activities fundamental to his religion.  *See Mbonyunkiza*, 956 F.2d at 1054 ("isolated, intermittent, or otherwise *de minimis* denial or interruption of an inmate's religiously required diet does not substantially burden his religious beliefs").  The lockdown did not substantially burden Hageman in this way.

---

[11] In his response to Defendants' motion, Hageman alleges for the first time that the lockdowns prevented him from attending four church services, rather than the one on August 11 that he mentions in his Complaint.  (*Compare* Compl. ¶¶ 10, 12, 14, 15 *with* Mem. Opp'n Mot. Summ. J. at 7; Hageman Decl. ¶ 20–21 [ECF No. 123-1 at 6].)  Aside from whether he should be permitted to assert additional incidents of a denial of free exercise that he did not assert in his Complaint, the Court finds that he did not introduce sufficient evidence in response to the motion for summary judgment to support those additional claims.  As already noted, his opposition memorandum is not evidence, and in his declaration, he provides no detail as to those additional services or to the circumstances under which he claims to have been denied the opportunity to attend.

Hageman finally argues that Defendants substantially burdened his free exercise by refusing his request to meet with a clergy-person while in lockdown. (Mem. Opp'n Mot. Summ. J. at 8.) According to the Inmate Handbook, an inmate may request a meeting with a clergy-person, and Defendants assert that Hageman could have made that request while in lockdown, but MacKissock and Brummer declare that to their knowledge, Hageman never made that request to the jail. (MacKissock Decl. ¶ 17; Brummer Decl. ¶ 10; MacKissock Decl. Ex. 13 [ECF No. 115-1 at 45].) Hageman states that on August 17, he called a person named Marshall, who holds church service at the jail, to ask for a meeting about his Bible; he declares this phone call was his request to meet with a clergy-person and that Defendants ignored it. (MNMorrison_20190817_143332_PhoneCard_2188310402; Hageman Decl. ¶ 14 [ECF No. 123-1 at 4–5].) But Hageman presents no evidence this call alerted the jail staff that he wanted to meet Marshall, that he submitted a meeting request to the jail staff, or that they denied that request. Defendants cannot have substantially burdened Hageman's exercise of his religious beliefs when he never asked them for a meeting with clergy and they never refused it.

Because reasonable jurors could not find on this record that any of the named Defendants substantially burdened Hageman's exercise of his religious beliefs, the Court recommends that Defendants be granted summary judgment on these claims. In view of this recommendation, the Court does not address Defendants' argument in the alternative that the doctrine of qualified immunity shields Wise and Brummer from liability for this

claim.  (Mem. Supp. Mot. Summ. J. at 20.)

### C.    Claims of Retaliation for 2018 Lawsuit and Interference with Hageman's Exercise of His Right to Free Speech

Hageman next claims that Defendants violated the First Amendment by retaliating against him for his 2018 Lawsuit and by attempting to "chill" and interfere with his filing of the instant lawsuit.[12]  (Mem. Opp'n Mot. Summ. J. at 8–9.)

"It is well-settled that as a general matter, the First Amendment prohibits government officials from subjecting an individual to retaliatory actions on the basis of his constitutionally protected speech."  *Solomon v. Petray*, 795 F.3d 777, 787–88 (8th Cir. 2015) (quotation omitted).  To prevail on a claim of government retaliation for protected speech, Hageman must show three things: (1) he engaged in protected speech; (2) the government took adverse action against him that would chill a person of ordinary firmness from continuing the speech; (3) the adverse action was motivated at least in part by his protected speech.  *Id.* at 786; *Evenstad v. Herberg*, 994 F. Supp. 2d 995, 1000 (D. Minn. 2014).  "[U]pon a prima facie showing of retaliatory harm, the burden shifts to the defendant official to demonstrate that even without the impetus to retaliate he would have taken the action complained of."  *Hartman v. Moore*, 547 U.S. 250, 260 (2006).  If the defendant can show this, "the First Amendment principle at stake is sufficiently vindicated [because the plaintiff] is placed in no worse a position than if he had not

---

[12] The Court previously dismissed Hageman's claim for denial of access to the courts on the ground that the allegations in the Complaint were not sufficient to support that an injury occurred. (Apr. 22, 2020 R&R at 6; June 30, 2020 Order Adopting R&R.)

engaged in the protected speech." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019).

Applying this standard here, the Court recommends that summary judgment be granted

for Hageman's retaliation and interference claims against all Defendants except Wise,

Brummer, and MacKissock.

      Because Hageman had not filed the current lawsuit when in Morrison County Jail,

that part of his claimed retaliation does not fit neatly within the first element.  The parties

did not cite, and the Court could not locate a case in which the Court of Appeals for the

Eighth Circuit or a court in this District addressed whether a threat to initiate a lawsuit is

protected First Amendment activity for a retaliation claim.  The Court of Appeals for the

Ninth Circuit, considering a prisoner's claim of retaliation, found that that prisoner's

threat to file a suit against prison officials was protected conduct.  *Entler v. Gregoire*, 872

F.3d 1031, 1041–43 (9th Cir. 2017).  *See also White v. McKay*, Case No. 18-1473, 2019

WL 5420092, at *2 (6th Cir. June 27, 2019) (*citing Pasley v. Conerly*, 345 F. App. 981,

984–85 (6th Cir. 2009)) (concluding similarly when plaintiff threatened to file a

grievance).  The Court acknowledges disagreement among district courts on this

question.  *See Gibson v. Fischer*, Case No. 9:10-CV-0968 (LEK/TWD), 2014 WL

7178346, at *15–16 (N.D.N.Y. Dec. 15, 2014) (collecting district court cases showing a

split).  But in the absence of contrary precedent from the Eighth Circuit, the Court agrees

with the Ninth Circuit in *Entler* that "it is illogical to conclude that prison officials may

punish a prisoner for *threatening* to sue when it would be unconstitutional to punish a

prisoner for *actually* suing."  872 F.3d at 1042–43.  "The most fundamental of the

constitutional protections that prisoners retain are the First Amendment rights to file prison grievances and to pursue civil rights litigation in the courts, for without those bedrock constitutional guarantees, inmates would be left with no viable mechanism to remedy prison injustices." *Id.* at 1039. In any event, Defendants do not argue that Hageman did not engage in protected speech or suggest a First Amendment distinction between his prior and anticipated lawsuits. The Court is satisfied that Hageman's retaliation claim properly includes both prior and anticipated lawsuits of which Defendants were aware.

In his memorandum and declaration filed in opposition to this motion, Hageman points to the following specific acts in support of these claims:[13]

1) Wise placed him in lockdown three times for alleged rule violations and admitted at least as to the spoon incident lockdown that it was in retaliation for his 2018 lawsuit;

2) Brummer affirmed the lockdown for the intimidation incident and placed him in lockdown for alleged rule violations for which lockdown is not permitted discipline, tried to confiscate his legal documents and evidence for the current lawsuit, scared him into his cell when he was trying to call the FBI to report the retaliatory behavior, and told him that a lawsuit would never happen;

---

[13] Hageman also claims the destruction of his Bible was in retaliation for the litigation, (Compl. ¶ 2), but as already discussed, *supra,* he does not allege that any of the named Defendants was involved in that incident. Thus, it cannot provide a basis for any of Hageman's claims against these Defendants, including for retaliation.

3)      MacKissock affirmed the lockdowns for the intimidation incident and camera incident even though lockdown is not a permitted punishment for those rules violations; tried to confiscate his legal documents and evidence for the current lawsuit on one occasion, and did confiscate some of his legal papers prior to Hageman's transfer to state prison;

4)      Worlie affirmed the lockdown for the intimidation incident and failed to respond to Defendant's concerns about retaliation;

5)      Whitlow put his breakfast tray on his cell toilet;

6)      Dzieweczynski refused to record Hageman's statement or give him a civil complaint form regarding Wise's retaliatory lockdowns, failed to act on Hageman's complaints about MacKissock's, Brummer's, and Wise's conduct, and, together with MacKissock, seized his legal papers prior to his transfer to state prison.

Defendants do not contest that Hageman's lawsuits were protected speech. They instead respond that their actions could not have chilled Hageman's speech because he still filed the current lawsuit, that Hageman failed to present cognizable evidence of any retaliatory motive for their actions, and that Wise's lockdowns would have happened regardless of retaliatory motive. (Mem. Supp. Mot. Summ. J. at 21–23.) The Court analyzes each defendant in turn.

### 1.    Wise

Hageman asserts each of the lockdowns imposed on him by Wise was driven by a

retaliatory motive.  Defendants respond that Wise imposed the lockdowns for Hageman's violation of jail rules, meaning he cannot be liable even if motivated by retaliation. (Mem. Supp. Mot. Summ. J. at 23–24.)  This position enjoys strong support in Eighth Circuit precedent.  When an inmate claims that a jail official retaliated for protected speech by imposing disciplinary actions, that "claim[] . . . fail[s] if the alleged retaliatory conduct [was] issued for the actual violation of a prison [or jail] rule." *Hartsfield v. Nichols*, 511 F.3d 826, 829 (8th Cir. 2008).  The jail official need only show "some evidence" that the inmate violated a jail rule, and that he imposed the punishment in part for that violation.  *Id.*  "[A] report from a correctional officer, even if disputed by the inmate and supported by no other evidence, legally suffices as 'some evidence' upon which to base a prison disciplinary violation, if the violation is found by an impartial decisionmaker."  *Id.* at 831.

Looking at the lockdowns in turn, the Court finds there is at least some evidence supporting rule violations in the camera and intimidation incidents.  For the camera incident, Wise's report is supported by clear video evidence showing the actions Wise alleged in the violation report.  MacKissock sustained the violation after his review.

Similarly, for the intimidation incident, Wise's report is supported by video evidence of the interaction, plus a review by MacKissock and an appeal panel of decisionmakers who were not involved in the underlying incident.  Though Hageman argues the panel was not impartial because it comprised jail staff that he claims were also motivated to retaliate against him, he does not offer any specific evidence to support that

claim.  (Mem. Opp'n Mot. Summ. J. at 9.)  For that reason, the camera and intimidation incidents have at least some evidence, supported by impartial decisionmakers, that Hageman violated jail rules and received the lockdowns as discipline.  Therefore, even if those lockdowns were retaliatory, there is no genuine dispute that they were imposed for rule violations, so the Court recommends that summary judgment be granted against those claims.

But the spoon incident differs because Wise's report of Hageman's violation was not upheld by an impartial decisionmaker.  Although MacKissock believed Wise had *requested* that Hageman remove his spoon, he dismissed the penalty because he concluded Wise's communication with Hageman was not clearly a direct order, and no other impartial jail staff reviewed the alleged violation.  As a result, Wise's report and declaration about this incident, unsupported by a neutral reviewer and in the face of Hageman's declaration that Wise never even asked him to remove the spoon, does not definitively satisfy the "some evidence" standard.

Therefore, the Court must turn to whether there is a genuine issue of material fact about whether Wise's action in connection with that incident was "chilling."  First, the Court disagrees with Defendants' argument that as a matter of law, none of their alleged actions can be regarded as chilling simply because Hageman filed the current lawsuit. The question is whether the government's action would chill a person of ordinary firmness in the plaintiff's position from continuing the constitutional activity, and does not require that the action chilled the specific plaintiff.  *Santiago v. Blair*, 707 F.3d 984,

992 (8th Cir. 2013).  How the plaintiff acted might be evidence of what a person of ordinary firmness would have done, but it is not proof positive that the action is not chilling, and "this sort of question is usually best left to the judgment of a jury."  *Id.* Further, "since there is no justification for harassing people for exercising their constitutional rights [the chilling effect] need not be great in order to be actionable." *Evenstad v. Herberg*, 994 F. Supp. 2d 995, 1001 (D. Minn. 2014).  A reasonable jury could conclude that imposing the strict deprivations of lockdown, eliminating physical interaction with other humans and confining a person to a small cell except for an hour a day, would chill an ordinary person from speaking.  *See id.* (finding that placing a civilly confined person in protective isolation, akin to solitary confinement, would chill speech.)

Finally, there is sufficient evidence to create a genuine dispute about whether Wise acted in retaliation.  Hageman claims that in the course of a conversation one evening Wise admitted to him that the spoon incident lockdown was in retaliation for the 2018 lawsuit.  The Court recognizes there are reasons why a factfinder might choose to disbelieve this account, including that the other two lockdowns imposed by Wise were upheld (and even the spoon lockdown was dismissed only because of ambiguity about whether Wise had clearly given a direct order).  Furthermore, in the space of just a few weeks, Hageman had incurred other disciplinary infractions issued by other jail officers that he does not challenge in this lawsuit or cite as evidence of retaliatory intent.  Finally, Wise was not a defendant in the 2018 lawsuit (*see* 2018 Lawsuit Compl.), and Hageman points to no evidence that Wise was aware of his plans to file a new lawsuit.  But Wise's

28

declaration in support of this motion does not mention, let alone refute Hageman's account of the alleged conversation, and the arguments against Hageman's claim of retaliatory intent are not sufficient as a matter of law to resolve the issue of disputed fact raised by Hageman's sworn declaration that Wise admitted the lockdown was for a retaliatory purpose.

Accordingly, the Court cannot recommend summary judgment in Wise's favor on Hageman's claim for retaliation related to Wise's imposition of a lockdown in connection with the spoon incident.

### 2.    Brummer

The record on summary judgment does not support the allegation that Brummer affirmed the lockdown for the intimidation incident either to retaliate against him for the 2018 lawsuit or to dissuade him from filing the instant lawsuit. Brummer was involved only as one member of the three-person appeal panel reviewing the intimidation incident. Brummer states in his declaration that the panel affirmed the lockdown because it substantiated the disorderly conduct. (Brummer Decl. ¶ 11.) For the same reasons that this lockdown was not an adequate basis to sustain a claim of retaliation against Wise, neither does it sustain such a claim against Brummer. Furthermore, as for Hageman's contention that lockdown was not permitted discipline for this incident, (Compl. ¶ 12c), he offers no support for that position, and the Inmate Handbook clearly permits lockdown as a punishment for intimidating language, which is considered a form of disorderly conduct. (MacKissock Decl. Ex. 13 [ECF No. 115-1 at 5–6].)

29

Nor is there evidence that Brummer deliberately or for a retaliatory or "chilling" purpose interrupted Hageman's purported attempt to call the FBI. Hageman offers no evidence that Brummer intended to interrupt the phone call or threaten Hageman when he stepped into the cell block. Though Hageman claims Brummer moved in an intimidating way, the camera footage shows Brummer merely step into the doorway of the cell block. Hageman does not report any statements by Brummer, and the camera shows no overt threat or pursuit by Brummer when Hageman ran into his cell. There is also no evidence that Brummer knew who Hageman was trying to call, as might support an allegation that Brummer was trying to stop Hageman from contacting outside law enforcement.

But Hageman's account of Brummer's alleged attempt to seize Hageman's legal papers together with his alleged statements to Hageman that he would take his papers and that a lawsuit would never happen does raise a genuine dispute and is sufficient to make summary judgment for Brummer on this claim inappropriate. A prison official seizing and destroying a prisoner's legal notes and making intimidating statements about a prisoner's lawsuit can chill a prisoner of ordinary firmness from exercising his First Amendment rights to speak through legal action. *See Bell v. Young*, Case No. 4:21-cv-04134 (LLP), 2021 WL 3809363, at *3, 5 (D.S.D. Aug. 25, 2021) (holding in the context of a motion to dismiss that such allegations plausibly support the "chilling" element of a retaliation claim). Although the evidence supporting Hageman's version of the encounters with Brummer and of any retaliatory motive on Brummer's part is sparse, to say the least, there is no evidence that definitively disproves Hageman's sworn

description of these incidents or that offers an alternative, penologically valid explanation for the alleged entry into Hageman's cell and attempt to take his legal papers, and the later threat to do so. Therefore, Hageman's sworn account raises a question for jury resolution regarding whether Brummer engaged in a pattern of behavior intended to intimidate Hageman into not pursuing the current lawsuit. The Court recommends against granting summary judgment in Brummer's favor on this claim.

### 3.    MacKissock

As with Brummer, there is no evidence that MacKissock retaliated against Hageman for the 2018 Lawsuit or sought to "chill" Hageman's plans to file the instant lawsuit by affirming the lockdowns for the intimidation incident and camera incident. As explained for Wise, "some evidence" supports the lockdown for a rule violation from the intimidation incident. As for whether lockdown was a permitted disciplinary response, the Inmate Handbook provides that lockdown was a permitted punishment for those violations, (MacKissock Decl. Ex. 13 [ECF No. 115-1 at 48–49]), so Hageman's unsupported claim to the contrary fails. Therefore, these two claims of alleged retaliation cannot survive MacKissock's motion for summary judgment.

But Hageman also alleges MacKissock's involvement with Brummer in the alleged attempt or attempts to seize Hageman's legal papers was intended to "chill" or inhibit Hageman from filing the instant lawsuit. For the same reasons described above with respect to Brummer, the Court finds that although the evidence as to motivation is thin, Hageman's sworn allegations, including that Brummer declared that the "lawsuit

will never happen" during the August 28 encounter among Hageman, Brummer, and McKissock, would permit a jury to conclude MacKissock joined in Brummer's attempt to seize Hageman's papers for the purpose of dissuading him from pursuing this lawsuit. Therefore, the Court recommends against granting MacKissock's motion for summary judgment as to this claim.

### 4.    Dzieweczynski, Worlie, and Whitlow

Hageman's retaliation claims against Dzieweczynski, Worlie, and Whitlow fail due to lack of evidence of retaliatory motive or an intent to interfere with his right to pursue the instant lawsuit. He relies on the conclusory statements in his complaint, declaration, and phone calls and writings from his jail time in which he expressed his belief that these Defendants were retaliating against him for the prior suit and/or trying to prevent him from filing this suit. (Mem. Opp'n Mot. Summ. J. at 8–9.) But no matter when or how he recorded his belief, it is not evidence that Defendants' various alleged actions were in retaliation for his lawsuits without admissible evidence from which a reasonable jury could infer that Defendants' states of mind or motivations were related to those suits. *See Charps Welding & Fabricating*, 950 F.3d at 524 ("[c]onclusory assertions and citations to one's own arguments are insufficient to survive summary judgment.") The closest he comes is his allegation that Dzieweczynski was involved in taking his legal papers from him on his last day in the Morrison County Jail prior to his transfer to state prison, but there is no evidence from which the inference could be drawn that Dzieweczynski even knew he intended to file a lawsuit, let alone that his conduct

was intended to "chill" or thwart his plans to do so as opposed to implementing the ordinary process associated with gathering and transferring an inmate's possessions upon a change in custody.

### 5.    Remaining Defendants

Hageman argues generally that "the adverse actions of Defendants would not have been taken absent the retaliatory motives of all the named Defendants," and that "Defendants each retaliated against Hageman to "Chill" him from filing a Federal lawsuit."  (Mem. Opp'n Mot. Summ. J. at 8.)  However, as already noted, allegations against "Defendants" generally are not sufficient, and conclusory statements about his belief in their motivations are not cognizable evidence.

Because Hageman shows genuine disputes regarding only the specific retaliation claims described above against Wise, Brummer, and MacKissock, the Court recommends that Defendants' motion for summary judgment be granted on the other retaliation claims.

### D.    Due Process Claims

Hageman next claims that Defendants denied him his constitutional due process rights related to the lockdowns.  (Mem. Opp'n Mot. Summ. J. at 9–10.)  The Due Process Clause of the Fourteenth Amendment protects people against the government taking their life, liberty, or property without first going through the constitutionally required due process.  *See Phillips v. Norris*, 320 F.3d 844, 846 (8th Cir. 2003).  Hageman must first show that Defendants deprived him of life, liberty, or property before arguing that they

failed to follow the constitutional due process.

He lost neither life nor property in the lockdowns, so he must identify how the lockdowns robbed him of constitutionally protected liberty. *Id.* Inmates have lesser due process protections against the loss of liberty than free people. *Sandin v. Conner*, 515 U.S. 472, 484 (1995). Specifically in the context of an inmate's conditions of confinement in jail, the only liberty protected by the Due Process Clause is a "freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484 (quotation and citation omitted). The Court of Appeals for the Eighth Circuit has "consistently held that a demotion to segregation [i.e. lockdown], even without cause, is not itself an atypical and significant hardship." *Phillips*, 320 F.3d at 847. The Court must determine the level of hardship by "compar[ing] the conditions to which the inmate was exposed in segregation with those he or she could expect to experience as an ordinary incident of prison life. . . . [The Court does] not consider the procedures used to confine the inmate in segregation." *Id.*

Hageman points to evidence that he lost access to church service and REC during lockdown. He offers no further explanation nor evidence of how his conditions in lockdown differed from the general jail population. Typically, a short or intermittent limit on attending religious services is not extreme enough to be an "atypical and significant hardship" in jail. *Id.* Hageman also had both of his Bibles in his cell (though one was damaged), and he had the option to request a meeting with a clergy-person, so he

had the ability to engage in some of his religious practices and spiritual discussion. *See id.* On this evidence, Hageman fails to show that he lost any constitutionally protected liberties through the lockdowns, so summary judgment is appropriate for this claim.

Furthermore, even if the lockdowns deprived Hageman of a protected liberty interest, he received all the due process constitutionally required. (Mem. Supp. Mot. Summ. J. at 25–27.) An inmate facing disciplinary sanctions that would deprive him of property or liberty is entitled to due process before those sanctions. *Turner v. Caspari*, 38 F.3d 388, 390 (8th Cir. 1994). The inmate is entitled to advance written notice of the claimed misconduct, a hearing at which he may call witnesses and present documentary evidence, and a written statement of the evidence relied upon by the factfinder and the reasons for the disciplinary action. *Dible v. Scholl*, 506 F.3d 1106, 1110 (8th Cir. 2007). *See also Wolff v. McDonnell*, 418 U.S. 539, 564–66 (1974) (holding that an inmate must be provided written notice of the charges against him at least 24 hours in advance of a hearing, to inform him of those charges and enable him to marshal facts and witnesses in his defense). A written notice should provide general information about the date, place, and nature of the alleged misconduct. *Dible*, 506 F.3d at 1110.

Hageman contends he did not receive timely written notice of the alleged rule violations and description of his conduct in the spoon incident, nor was he given a notice of his due process rights or a notice of due process hearing date. (Compl. ¶¶ 4(a)–(c).)

The Jail Inmate Handbook details an inmate's due process rights and indicates that the jail follows them for all disciplinary sanctions. (MacKissock Decl. Ex. 13 [ECF No.

115-1 at 50–51].)  MacKissock declares that all inmates receive a copy of the handbook during booking, Hageman received a copy, and Hageman read it.  (MacKissock Decl. ¶ 12.)  The record of Hageman's intake interview ("primary classification interview") corroborates this declaration, as it shows that Hageman answered affirmatively when asked if he had read the Inmate Handbook.  (MacKissock Decl. Ex. 5 [ECF No. 115-1 at 19].)  Hageman therefore had notice of his due process rights upon entering the jail and at any time he chose to read the handbook.

Regarding the spoon incident, MacKissock provided Hageman due process.  He met with Hageman three days after the incident, presented him with the written incident report and violation report, explained the violation to him, and dismissed the lockdown. (MacKissock Decl. ¶ 13.)  Hageman concedes this.  (Compl. ¶ 4(d).)  The incident report describes the date, time, activities, and names of those involved.  (Wise Decl. Ex. 9 [ECF No. 116-1 at 3].)  The violation report shows as "dismissed."  (*Id.*)  There is no genuine dispute that this meeting provided Hageman due process for the violation, and that he did not need a hearing date once MacKissock dismissed it.

Hageman claims in his responsive memorandum further due process violations related to his hearing on the August 11 intimidation incident.  (Mem. Opp'n Mot. Summ. J. at 9–10.)  But Hageman did not include these allegations in his complaint, or even in his sworn declaration, and the Court will not allow him to add them at this late stage.

Because Hageman fails to show a genuine dispute over whether the lockdowns created sufficient hardships compared to general jail life, and over whether he received

36

due process for the spoon lockdown, he cannot establish any deprivation of liberty without due process. The Court recommends summary judgment on the claims.

### E. Conspiracy Claims

Hageman next claims that Defendants conspired to deny him free exercise, retaliate for his lawsuits, and deny him due process. (Mem. Opp'n Mot. Summ. J. at 11–13.) He brings this claim under 18 U.S.C. §§ 241 and 371 (2019). (Compl. ¶ 78.) Defendants correctly argue that both sections are federal criminal statutes which the government may enforce through criminal prosecution, but which private individuals cannot use to sue someone (i.e. the statutes offer no "private cause of action"). *Shahin v. Darling*, 606 F. Supp. 2d 525, 538 (D. Del. 2009) (citing *United States v. Philadelphia*, 644 F.2d 187 (3rd Cir. 1980)); *Mazzeo v. Gibbons*, 649 F. Supp. 2d 1182, 1198 (D. Nev. 2009) (citing *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980)). Hageman "cannot bring criminal charges against defendants through a private lawsuit, and these sections do not give rise to a civil cause of action." *Darling*, 606 F. Supp. 2d at 538.

If Hageman intended to bring a civil conspiracy claim, he fails to support it. A conspiracy requires "an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *Gometz v. Culwell,* 850 F.2d 461, 464 (8th Cir.1988). "A plaintiff must allege with 'sufficient particularity' and demonstrate with 'specific material facts' that the parties reached some agreement and conspired together to deprive plaintiff of a federal right." *Id.* Hageman argues that he has four witnesses who could support the existence of the conspiracy, and that a jury

37

could infer Defendants' collective agreement to join in the conspiracy based on his complaint.  (Mem. Opp'n Mot. Summ. J. at 11–12.)  First, Hageman's claims cannot survive a motion for summary judgment based on his promise to bring witnesses to support him in the future; he must rely on the facts currently in the record.  *Thulin v. EMC Mortg. Corp.*, Case No. 06-cv-3514 (RHK/JSM), 2007 WL 3037353, at *3 (D. Minn. Oct. 16, 2007).  Second, Hageman's declarations of conspiracy state only that Whitlow and Waltman admitted they had been part of a conspiracy in 2018, but do not suggest any specific facts showing an agreement among Defendants to conspire against Hageman in 2019.  *See Gometz*, 850 F.2d at 464 ("Bare allegations of certain statements by a defendant without any other proof of a conspiracy, are insufficient to sustain a conspiracy claim.")

Hageman also offers as evidence of the Defendants' agreement (1) videos showing harmless interactions between him and various Defendants, which he claims show them committing violent crimes; (2) three jail phone calls without any recorded speech and which end after several seconds that he declares were his attempts to call the FBI but blocked by the jail; (3) several grievances and requests he submitted to the jail asking to speak with Larsen and Worlie; and (4) citations to conclusory claims or vague evidence in his declaration and complaint.  (Mem. Opp'n Mot. Summ. J. at 11–12.)  A jury could not reasonably find an agreement to conspire against Hageman based on this evidence. Viewing the record as a whole, it lacks any facts supporting the agreement Hageman claims, even if he had pleaded a claim for civil conspiracy.  Because Hageman fails to

raise a genuine dispute over Defendants' alleged agreement to conspire against him, the Court recommends summary judgment on this claim.

### F.    Battery Claim Against Orth

Hageman also claims that Orth committed the tort of battery against him when she stopped him from entering the clothing closet.  (Mem. Opp'n Mot. Summ. J. at 10–11.) Battery is a state law claim, legally distinct from Hageman's § 1983 claims, and is defined as "an intentional unpermitted offensive contact with another." *Paradise v. City of Minneapolis*, 297 N.W.2d 152, 155 (Minn. 1980).

Defendants argue that the state law doctrine of official immunity shields Orth from liability for the alleged battery.  (Mem. Supp. Mot. Summ. J. at 29–30.)  "The doctrine of common law official immunity provides that a public official charged by law with duties which call for the exercise of his judgment or discretion is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong."  *Anderson v. Anoka Hennepin Indep. Sch. Dist. 11*, 678 N.W.2d 651, 655 (Minn. 2004) (quotation omitted).

> Imposing liability for discretionary acts would deter public officials from exercising their judgment when making the difficult decisions often necessary to effectuate the public policies mandated by law. On the other hand, imposing liability for ministerial acts merely encourages public officials to exercise care while performing duties that require little or no independent judgment.

*Shariss v. City of Bloomington*, 852 N.W.2d 278, 281 (Minn. App. 2014).

When analyzing a claim of official immunity, Minnesota courts must first identify

the specific government officer and conduct at issue, then determine whether the officer

acted under a discretionary or ministerial duty, and finally, if the duty was

discretionary, determine whether the officer acted willfully or maliciously in executing

the duty. *Elven v. St. Louis Cty.*, No. A20-1292, 2021 WL 1732271, at *2 (Minn. App.

May 3, 2021) (citing *Vassallo ex rel. Brown v. Majeski*, 842 N.W.2d 456, 462 (Minn.

2014).)  An officer does not enjoy official immunity for acts that were part of a

ministerial duty, nor for willful or malicious wrongs committed while performing a

discretionary duty. *Id.*  The party claiming immunity bears the burden to prove

entitlement to it. *Brown v. City of Bloomington*, 706 N.W.2d 519, 522 (Minn. App.

2005).

Minnesota courts distinguish between discretionary and ministerial duties by

focusing "on the nature of the act itself and acknowledg[ing] that in doing so almost any

act involves some measure of freedom of choice." *Schroeder v. St. Louis Cty.*, 708

N.W.2d 497, 507 (Minn. 2006).  "A discretionary duty involves individual professional

judgment that necessarily reflects the professional goal and factors of a situation."

*Vassallo*, 842 N.W.2d at 462 (quotation omitted).  It typically involves "responding to

uncertain circumstances that require the weighing of competing values on the grounds

that these circumstances offer little time for reflection and often involve incomplete and

confusing information such that the situation requires the exercise of *significant*,

independent judgment and discretion." *Shariss*, 852 N.W.2d at 282.  In contrast, "[a]

ministerial duty is one that is absolute, certain, and imperative, involving merely the

execution of a specific duty arising from fixed and designated facts." *Vassallo*, 842 N.W.2d at 462 (citations and quotations omitted).

Orth asserts that she has the duty to securely house inmates while ensuring that they obey the rules; this furthers the goals of maintaining order in the jail and ensuring the safety of staff, inmates, and volunteers. (Orth Decl. ¶ 3.) This duty requires varied interactions with inmates every day including escorting them around the jail. (*Id.* ¶ 3.) She also declares that her training and work experience makes her aware of where in the jail inmates may go and where they may not. (*Id.* ¶ 4.) She declares that Hageman was not allowed in the clothing closet, so she put up her hand to use minimal force to stop him from walking in. (*Id.* ¶¶ 6, 8.)

There is no genuine dispute that Orth acted in the furtherance of a discretionary duty. Stopping Hageman from entering the clothing closet where he was not permitted, or, put another way, keeping him in the area where he was permitted, required Orth to weigh professional goals of ensuring inmate safety and health and ensuring order through the following of jail rules, when she had only seconds to decide how best to do so and the discretion to make the call herself.

Because Orth acted in the performance of a discretionary duty, she is only liable if she acted willfully or maliciously. *See Berger v. Wynes*, No. A17-1342, 2018 WL 1787963, at *6 (Minn. App. Apr. 16, 2018). Malice and willful are synonymous for purposes of immunity law. *Id.* "Malice means nothing more than the intentional doing of a wrongful act without legal justification or excuse, or, otherwise stated, the willful

violation of a known right." *Casanova v. Tri-Cty. Cmty. Corr.*, No. A19-1996, 2020 WL
4280999, at *6 (Minn. App. July 27, 2020). "The exception to immunity for malicious
acts allows liability only when an official intentionally commits an act that he or she then
has reason to believe is prohibited." *Berger*, 2018 WL 1787963, at *6. This is a fact
question usually left for the jury, unless the court concludes there is no genuine disputes
of material fact. *Id.*

Even assuming for purposes of this analysis that Orth pushed Hageman
intentionally and without his permission, the evidence does not reasonably suggest that
Orth did so with any malice. She declares that she used minimal, appropriate force to
stop Hageman from entering the room, and had no reason to believe that she violated his
rights by doing so. (Orth Decl. ¶ 8.) Hageman points to nothing suggesting otherwise.
Though the camera fails to capture the moment of contact, the parties are out of sight for
only a few seconds, and Hageman returns to frame standing stable and without overt
signs of pain. He does not claim that he suffered any injury or pain from the push. True,
the push need not have injured Hageman or knocked him over to be malicious, but the
fact that the push did not physically disrupt him in any visible way strongly suggests that
Orth applied very little force. The push appears merely to have stopped Hageman's
forward movement, which is precisely what Orth concluded she needed to do to exercise
her responsibility to block Hageman from entering an area where he was not permitted.
On this evidence, a jury could not reasonably conclude that Orth acted out of malice, so
she is entitled to official immunity.

Defendants also argue Hageman's battery claim must fail because there is no evidence upon which a jury could conclude Orth used excessive force when stopping Hageman. (Mem. Supp. Summ. J. at 27–29.) Minnesota law authorizes officers to use reasonable force in effecting a lawful arrest or executing any other lawful duty. Minn. Stat. § 609.06, subd. 1(i), (iv) (2020). To establish a claim of battery against Orth, who was on-duty at the time and attempting to stop Hageman in the course of her duties in the jail, Hageman must demonstrate that she used excessive force to stop him. *Paradise*, 297 N.W.2d 152, 155 (Minn. 1980). As there is no evidence that Orth applied any more force than the minimum necessary to stop Hageman's forward movement, the Court agrees that a jury could not reasonably conclude that the force was excessive.

Because Orth committed the alleged battery while performing a discretionary duty and there is no evidence from which a reasonable jury could find she acted willfully and maliciously, and for the additional, independent reason that no reasonable jury could conclude the force was excessive, the Court recommends summary judgment in Orth's favor on this claim.

### G.    Vicarious Liability

Finally, Hageman claims Morrison County is vicariously liable for the harms committed by its employees against him. (Mem. Opp'n Mot. Summ. J. at 13–16.) Because the Court recommends that only Hageman's retaliation claims against Wise, Brummer, and MacKissock survive summary judgment, the Court analyzes whether the County might be liable for those claims. "*Respondeat superior* or vicarious liability will

43

not attach under § 1983." *City of Canton, Ohio v. Harris*, 109 S. Ct. 1197, 1203 (1989).

Thus, the County cannot be vicariously liable for Hageman's § 1983 claims against Wise,

Brummer, and MacKissock. Instead, Hageman must show that "there is a direct causal

link between a municipal policy or custom and the alleged constitutional deprivation."

*Id. See also White v. Jackson,* 865 F.3d at 1075 ("Since § 1983 does not allow for

vicarious liability, a plaintiff must identify a governmental policy or custom that caused

the plaintiff's injury to recover under that statute.") (internal quotes omitted).  Hageman

has failed to allege any such custom or policy, let alone adduce evidence that any custom

or policy of Morrison County played any role in these Defendants' alleged actions or in

any other way directly caused the deprivation of his constitutional rights. The Court

recommends granting summary judgment on this claim.

## RECOMMENDATION

The Court respectfully recommends Defendants' Motion for Summary Judgment

[ECF No. 112] be **GRANTED IN PART AND DENIED IN PART**.  The Court

recommends denying the motion as to the First Amendment retaliation claim against

Wise arising out of the spoon incident lockdown and as to the First Amendment

retaliation and interference with free speech claims against Brummer and MacKissock

arising out of the alleged attempt to seize Hageman's legal papers and intimidate him

from pursuing this lawsuit.  The Court recommends granting summary judgment in

Defendants' favor on all other claims, and that **JUDGMENT BE ENTERED**

**ACCORDINGLY**.

Dated: February 1, 2022

s/ Hildy Bowbeer
HILDY BOWBEER
United States Magistrate Judge

## NOTICE

**Filing Objections**: This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. *See* LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).